***********
Upon review of the competent evidence of record, including the briefs and oral arguments of the parties, with reference to the errors assigned and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 *********** RULINGS ON PLAINTIFF'S MOTIONS *Page 2 
Plaintiff moved, pursuant to Rule 701(7) of the Workers' Compensation Rules of the North Carolina Industrial Commission, for an Order allowing Plaintiff to include in the record additional evidence, including all of Plaintiff's medical records generated from Dr. Thomas Kern Carlton, III and other health care providers since the hearing before the Deputy Commissioner on April 24, 2009, on the grounds that such medical records will assist the Full Commission in its review of Plaintiff's appeal. Defendants did not submit a written response or objection to Plaintiff's Motion. After consideration of the written and oral arguments of Plaintiff, Plaintiff's Motion is hereby DENIED.
Plaintiff also moved, pursuant to N.C. Gen. Stat. § 97-18 and Rule 609 of the Workers' Compensation Rules of the North Carolina Industrial Commission, for an Order compelling Defendants to pay the temporary partial disability compensation awarded by the Deputy Commissioner in his January 8, 2010 Opinion and Award, and a 10 percent penalty for late payment of said benefits and attorney's fees, on the grounds that such compensation became due and payable under the terms of the January 8, 2010 Opinion and Award as of its filing. Defendants submitted a written response to Plaintiff's Motion, pursuant to Rule 609 of the Workers' Compensation Rules of the North Carolina Industrial Commission, stating that Plaintiff continues to be non-compliant with the January 8, 2010 Opinion and Award, thereby preventing him from receiving temporary partial disability compensation, and in the alternative, even if Plaintiff's attempts to return to work are sufficient to be in compliance, then any compensation owed by Defendants should be deducted from the overpayment of temporary total disability compensation due to the Deputy Commissioner's retroactive termination of such compensation. After consideration of the written arguments of Plaintiff and Defendants, Plaintiff's Motion is hereby DENIED. *Page 3 
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction over this matter.
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. The parties are correctly designated, and there is no question as to the joinder or the non-joinder of any party.
4. Insurance coverage existed on the date of injury.
5. Plaintiff sustained a compensable work injury on September 5, 2007; on September 18, 2007, Plaintiff began receiving benefits via a Form 63. On November 16, 2007, Defendants executed a Form 28T. On April 29, 2008, Plaintiff executed a Form 28U. As of the date of the hearing before the Deputy Commissioner, Defendants were continuing to pay temporary total disability and medical compensation.
6. An employment relationship existed between the parties during either some or all of the time period referenced in Stipulation Number Five.
7. Plaintiff's average weekly wage prior to his September 5, 2007 work injury was $1,009.80, yielding a compensation rate of $673.23.
8. The parties stipulated to the following documents being admitted into evidence as Stipulated Exhibit One:
 a. Plaintiff's medical records; *Page 4 
 b. Plaintiff's employment duty description;
 c. Plaintiff's expenses;
 d. Plaintiff's vocational rehabilitation records;
 e. North Carolina Industrial Commission forms and filings.
 *********** ISSUES
The issues to be determined are:
1. Whether Defendants' Form 24 should have been denied?
2. Whether Plaintiff is at maximum medical improvement?
3. Whether Plaintiff remains disabled?
4. Whether Plaintiff's average weekly wage should be modified?
5. Whether Defendants are obligated to provide ongoing medical compensation?
6. Whether Plaintiff unjustifiably refused suitable employment with Defendant-Employer?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 48 years old, with a date of birth of July 22, 1962. Plaintiff completed the ninth grade and has an employment history consisting of long-distance truck driving over the past 20 years. In July 2005, Plaintiff returned to work for Defendant-Employer as a long-distance truck driver. Plaintiff worked for Defendant-Employer as a long-distance truck driver *Page 5 
prior to July 2005, but left this employment for an unknown period of time. Plaintiff's duties as a long-distance truck driver required him to travel long distances.
2. On September 5, 2007, Plaintiff suffered a compensable injury by accident to his lower back, arising out of and in the course of his employment when he slipped on diesel fuel and fell backwards while refueling his truck. On September 18, 2007, Defendants accepted the compensability of Plaintiff's September 5, 2007 work injury via a Form 63 and began paying Plaintiff temporary total disability and medical compensation.
3. After Plaintiff's injury, he initially presented to Dr. Don Leo Hoover, a family medicine specialist, and received medication for lower back pain related to his September 5, 2007 work injury. Dr. Hoover later referred Plaintiff to Dr. Jeffrey Andrew Knapp, an orthopaedist, for further evaluation of his continued complaints of lower back pain. On November 8, 2007, Plaintiff underwent magnetic resonance imaging (MRI), which revealed an annular injury at the L5-S1 level of the spine, which Dr. Knapp felt was the cause of Plaintiff's lower back pain. Plaintiff received three epidural steroid injections, which provided some relief to his lower back pain, and also began physical therapy.
4. As a result of Plaintiff's injury, he was unable to work from September 7, 2007 through November 12, 2007. On November 13, 2007, Plaintiff began a trial return to work in a light-duty capacity working on the loading dock of Defendant-Employer. Defendants signed a Form 28T, Notice of Termination of Compensation by Reason of Trial Return to Work, on November 16, 2007. In January 2008, Plaintiff attempted to return to full-duty as a long-distance truck driver for Defendant-Employer. However, Plaintiff began to experience a recurrence of his lower back pain, and on February 22, 2008, Dr. Hoover and Dr. Knapp took him out of work *Page 6 
again. On April 29, 2008, Plaintiff filed a Form 28U giving notice that his trial return to work was unsuccessful. Defendants resumed payment of temporary total disability compensation.
5. On March 13, 2008, Plaintiff reported that his lower back pain was worse, and so Dr. Knapp ordered discography. In April 2008, Plaintiff underwent a discogram, which revealed pain generating from both the L4-L5 and L5-S1 levels of the spine. Dr. Knapp discussed surgical options with Plaintiff, but he opted to continue with conservative treatment.
6. On September 17, 2008, Plaintiff presented to Dr. Theodore Andrew Belanger, an orthopaedist, for a second surgical opinion. Dr. Belanger was of the opinion that Plaintiff would be a good candidate for a cognitive behavioral and functional restoration program. In addition, Dr. Belanger recommended that Plaintiff not undergo surgery, suggesting instead that he attend a program to improve his level of functioning and his ability to cope with his lower back pain.
7. On October 7, 2008, Dr. Knapp recommended a pain management specialist and a pain management program due to the severity of Plaintiff's lower back pain and his continued need for narcotics for pain relief. Dr. Knapp released Plaintiff to return to work in a light-duty capacity with work restrictions, including no repetitive bending, no lifting more than five pounds, and alternating between sitting or standing as needed.
8. On October 13, 2008, Mr. Ricky Tompkins, safety director and human resources officer for Defendant-Employer, sent Plaintiff correspondence offering him a guard shack position at Defendant-Employer's terminal in Hickory, North Carolina. According to a written description of the guard shack position, this job involved "monitoring drivers as they enter and leave the premises. Some paper work. Sitting or standing as needed." The October 13, 2008 correspondence from Mr. Tompkins to Plaintiff indicated that Defendant-Employer would pay Plaintiff $11.22 per hour for 40 hours of work per week and the job hours were 8:00 a.m. until *Page 7 
4:30 p.m. Wednesday through Sunday. However, based upon Defendant-Employer's testimony concerning the hours for the guard shack position, it appears that the work hours began around 5:00 p.m. on weekdays and may have involved daytime and night work on weekends.
9. According to Mr. Tompkins, whom Defendant-Employer employed for less than two years at the time of the April 24, 2009 hearing before the Deputy Commissioner, he created the guard shack position approximately one year earlier for the purpose of preventing theft by manning the main entry gate to the Hickory terminal during hours when regular employees were not present. When asked who staffed the guard shack, Mr. Tompkins testified that he hired "different folks off the street" to be guards. Mr. Tompkins then responded "[y]es, sir" when asked if the people hired were actually Gaines Motor Lines employees. Mr. Tompkins stated that although the guard shack position was available to the general public, he never advertised it because he was always able to fill it with employees and/or former employees who needed work.
10. Mr. Tompkins testified that a guard shack employee earns about $440.00 to $450.00 per week, and that the normal working hours are basically about eight hours, but "I try to work with the individual as much as possible. I mean we ain't got a [sic] set hours." Mr. Tompkins ultimately testified that the work hours for the guard shack position began sometime shortly after 5:00 p.m. and ended at mid-morning of the following day (which appeared to be around 1:00 a.m.). The position also required weekend work.
11. Mr. Tompkins further testified that after Plaintiff went back out of work following his return to work on light-duty, he heard nothing, so he sent Plaintiff a letter in October 2008 offering him the guard shack position, after holding the job for seven months. Mr. Tompkins' testimony indicates that he created the guard shack position around March 2008 and held it unstaffed, waiting on Plaintiff, for seven months. In response to the question of why Defendant-Employer *Page 8 
made the job offer to Plaintiff, Mr. Tompkins testified that "I've had to lay off drivers, and I offered him the job to try to bring him back. Basically we was [sic] already paying him as far as being out, and he did — we was — felt dedicated that he had been hurt on the job, so we brought him back to try to help him out and the company out."
12. Plaintiff did not accept the guard shack position and instead chose to attend the pain management program recommended by his treating physicians. According to Plaintiff, he notified Defendant-Employer that he could not accept the guard shack position because he was still experiencing pain, which he believed would prevent him from successfully maintaining employment. On October 31, 2008, Mr. Tompkins sent Plaintiff correspondence terminating his employment with Defendant-Employer because he failed to report to work for the guard shack position. Mr. Tompkins testified that he then offered the guard shack position to another employee of Defendant-Employer who worked in the warehouse.
13. On November 17, 2008, Defendants filed a Form 24 application, seeking to terminate Plaintiff's workers' compensation benefits due to his refusal of the guard shack position offered to him on October 13, 2008.
14. On or about November 21, 2008, Defendants authorized Plaintiff's participation in the functional restoration program administered by Dr. Thomas Kern Carlton, III, a pain management specialist, at The Rehab Center in Charlotte, North Carolina. The functional restoration program is designed to educate patients about their condition and teach them how to manage the pain, insomnia, depression, and anxiety that often accompany chronic pain conditions. It is a multidisciplinary approach involving medical treatment, psychotherapy, physical therapy, and vocational rehabilitation, eight hours per day, five days per week for *Page 9 
typically 20 days. Plaintiff participated in this functional restoration program from December 11, 2008 through January 21, 2009.
15. As of January 21, 2009, Dr. Carlton opined that Plaintiff was at maximum medical improvement, assigned him a 10 percent permanent partial disability rating to his back, and issued work restrictions based upon the functional status report generated during the functional restoration program. Plaintiff's work restrictions included frequent position changes throughout the workday and working in a light-to medium-duty category, with a 40-pound lifting restriction. Dr. Carlton also instructed Plaintiff to return to see him in a month. Dr. Carlton noted that Plaintiff "put forth excellent effort[,] . . . was compliant with all care [and made] gains in strength, endurance and flexibility" while participating in the functional restoration program. Plaintiff verbalized to Dr. Carlton that the functional restoration program was beneficial to him and that he was better able to control his pain.
16. Dr. Knapp saw Plaintiff in January 2009 following his completion of the functional restoration program. Based on Dr. Knapp's examination of Plaintiff at that time and a review of records from the functional restoration program, he assigned Plaintiff permanent work restrictions of no repetitive bending or lifting of over 25 pounds, along with the work restrictions contained in the functional status report generated during the program. Dr. Knapp assigned Plaintiff a three percent permanent partial disability rating to his back.
17. Dr. Knapp opined that Plaintiff may need fusion surgery in the future because his lower back complaints "may worsen" with age. He indicated, however, that the decision of whether to have the surgery was ultimately Plaintiff's, depending upon the severity of his lower back pain and how well he tolerated it. *Page 10 
18. On January 29, 2009, Special Deputy Commissioner Christopher B. Rawls denied Defendants' Form 24 application to terminate Plaintiff's compensation arising from his refusal of the October 13, 2008 job offer. The Special Deputy Commissioner found persuasive Plaintiff's participation in the functional restoration program and Dr. Carlton's opinion that it was reasonable for Plaintiff to defer attempting to return to work prior to completion of the program. The Full Commission finds as fact that Plaintiff's refusal of the guard shack position offered by Defendants on or about October 13, 2008 was justifiable.
19. On or about February 1, 2009, shortly after Plaintiff completed the functional restoration program, he called Mr. Roger Short, his former "boss man," and advised him that he completed the functional restoration program and needed to return to work. Mr. Short told Plaintiff that no positions were available and Defendant-Employer was currently on lay-off status. Plaintiff specifically asked about the guard shack position. Plaintiff testified that Mr. Short told him that the guard shack position was not a "real job," and if it were, he would have offered it to one of his drivers that was laid off from work. Mr. Short was the terminal manager and Mr. Tompkins answered to him in terms of the chain of command. The Full Commission finds Plaintiff's testimony about this conversation with Mr. Short to be credible.
20. Approximately a month after Plaintiff's conversation with Mr. Short, in correspondence dated March 6, 2009 from Defendants' counsel to Plaintiff's counsel, Defendants' counsel advised that Defendant-Employer was "willing to return plaintiff to work in the guard shack position." Defendants' counsel asked that Plaintiff contact Mr. Tompkins on the following Monday to schedule his work hours for the guard shack position. Plaintiff did not accept the guard shack position because of his belief that it was not a real job as conveyed to him by Mr. Short and upon advice of his counsel that it was not suitable employment. *Page 11 
21. On March 12, 2009, Dr. Carlton reviewed a description of the guard shack position and opined that it was within Plaintiff's work restrictions. Dr. Carlton was of the opinion that the guard shack position would assist in Plaintiff's transition back to gainful employment. In addition, Dr. John F. Riley, Plaintiff's treating psychologist from the functional restoration program at the Rehab Center in Charlotte, opined that the guard shack position would be helpful in Plaintiff's recovery from his ongoing symptoms of depression, which he related, in part, to Plaintiff's September 5, 2007 work injury.
22. The Full Commission finds as fact that Plaintiff made reasonable efforts on his own to find suitable employment, but remains unsuccessful. After Plaintiff's release from the functional restoration program, he contacted North Carolina Vocational Rehabilitation for assistance, and Ms. Pam Hallyburton became his vocational rehabilitation counselor. Although Plaintiff received a referral to participate in the Vocational Rehabilitation Work Program and made attempts to seek employment on his own through the Employment Security Commission and applying for work at companies in the area where he lives, he remained unsuccessful in obtaining suitable employment as of the date of the hearing before the Deputy Commissioner, which occurred approximately three months after Dr. Carlton determined that Plaintiff was at maximum medical improvement and released him from the functional restoration program. In addition to Plaintiff's vocational rehabilitation efforts, he has also been working to obtain his General Equivalency Diploma (GED) through a community college to improve his job prospects.
23. Following the hearing, the Deputy Commissioner allowed Defendants to depose Mr. Michael Leif Rennick, a current employee of Defendant-Employer and former friend of Plaintiff. Plaintiff deposed Mr. Finley Ray Curtis, Plaintiff's father, to rebut the testimony of Mr. Rennick. According to Mr. Rennick, Plaintiff participated in various physical activities that *Page 12 
were outside of his restrictions subsequent to his September 5, 2007 work injury. Specifically, Mr. Rennick alleged that Plaintiff assisted in renovating his kitchen, lifted items heavier than allowed by his restrictions, and participated in outdoor sporting activities such as boating and hunting subsequent to his September 5, 2007 work injury. However, Plaintiff's father indicated that Plaintiff did not participate in the kitchen renovation project in any way, other than purchasing some of the materials. In addition, Plaintiff's father stated that Plaintiff had not been boating or hunting in the past year, and that he had good days and bad days. On bad days, Plaintiff's pain level would be so severe that he needed assistance with some activities of daily living. Plaintiff's hearing testimony corroborated the testimony of his father concerning his physical capabilities and pain levels. The Full Commission gives greater weight to the testimony of Plaintiff and his father over any contrary testimony of Mr. Rennick.
24. Dr. Carlton is of the opinion and the Full Commission finds as fact that due to his chronic lower back pain resulting from his September 5, 2007 work injury, Plaintiff will need continued pain management and it is possible that Plaintiff will need fusion surgery in the future. Dr. Carlton was also of the opinion and the Full Commission finds as fact that Plaintiff will never be able to return to work as a long-distance truck driver and that Plaintiff cannot lift anything over 25 pounds frequently, or 35 pounds occasionally. Dr. Carlton indicated that he would be willing to continue to serve as Plaintiff's authorized treating physician. The Full Commission gives great weight to the opinion testimony of Dr. Carlton.
25. Dr. Riley opined and the Full Commission finds as fact that Plaintiff's depression was at least, in part, related to the chronic lower back pain resulting from his September 5, 2007 work injury, and that there was no way to apportion the sources of Plaintiff's depression between the work injury and other social changes in his life. Dr. Riley was also of the opinion that as of *Page 13 
March 2009, Plaintiff was not at maximum psychological improvement with respect to his work-related depression. Dr. Riley recommended further psychological treatment/therapy for Plaintiff in connection with his work-related depression. The Full Commission gives great weight to the opinion testimony of Dr. Riley, but further finds that Dr. Carlton was aware of Plaintiff's depression when he released him from the functional restoration program on January 21, 2009, found him at maximum medical improvement, and gave him work restrictions.
26. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff was at maximum medical improvement with respect to his September 5, 2007 work injury to his lower back as of January 21, 2009, that Plaintiff has a 10 percent permanent partial disability rating to his back, and that he requires further medical treatment and psychological therapy.
27. Based upon the greater weight of the evidence, the Full Commission finds as fact that the evidence is insufficient to establish that the guard shack position was a "real job" that Defendant-Employer made available to the general public, or even to its own laid-off employees. Mr. Short, who held a higher managerial position than Mr. Tompkins, told Plaintiff the guard shack position was not a "real job." Also, the Full Commission is not persuaded by the testimony of Mr. Tompkins that he never advertised the guard shack position because there were always enough employees needing work to keep the position filled, considering the evidence presented through Mr. Tompkins that Defendant-Employer held the position for seven months unfilled, pending Plaintiff's acceptance of it in October 2008, that the position was open in March 2009, despite the company lay-offs, and that as of the date of the hearing before the Deputy Commissioner, the former, unnamed warehouse employee who purportedly worked in *Page 14 
this position only worked Monday and Tuesday nights. The Full Commission does not find Mr. Tompkins' testimony concerning the guard shack position to be credible.
28. Based upon the greater weight of the evidence, the Full Commission further finds as fact that the guard shack position does not constitute suitable employment for Plaintiff. The guard shack position would have paid approximately $450.00 per week, which was less than half of Plaintiff's pre-injury average weekly wage of $1,009.80 and is not indicative of any wage-earning capacity Plaintiff may have. Defendant-Employer did not advertise the guard shack position and the evidence is insufficient to prove that Defendant-Employer offered it to the general public or filled the position after Plaintiff declined it, despite any testimony by Mr. Tompkins to the contrary. Also, Defendants failed to produce sufficient evidence to show that employers other than Defendant-Employer would hire Plaintiff to do a similar job at a comparable wage or that the guard shack position afforded Plaintiff any potential for advancement or income growth. The evidence further indicates that Defendants offered the guard shack position to Plaintiff to help him out and the company out because the company was already paying Plaintiff (apparently, workers compensation). Consequently, the guard shack position would not be a measure of Plaintiff's ability to attain employment in the competitive employment market or his capacity to earn wages in the competitive marketplace.
29. The Full Commission finds that although Plaintiff's treating physicians approved the guard shack position as being within his permanent work restrictions when Defendants offered it to him again in March 2009, Plaintiff's refusal of this position was justifiable because, for the reasons stated above, it was not a "real job" and it did not constitute suitable employment for Plaintiff.
 *********** *Page 15 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On September 5, 2007, Plaintiff sustained a compensable work injury arising out of and in the course of his employment as a direct result of a specific traumatic incident of the work assigned by Defendant-Employer, resulting in an injury to his lower back. N.C. Gen. Stat. § 97-2(6) (2009).
2. As a direct and natural consequence of Plaintiff's September 5, 2007 work injury to his lower back, Plaintiff developed depression, which is also compensable. Roper v. J.P.Stevens Co., 65 N.C. App. 69, 308 S.E.2d 485 (1983).
3. The medical treatment Plaintiff received has been reasonably required to effect a cure, provide relief, or lessen his disability, and Defendants are obligated to pay for such treatment. As a result of his continuing lower back pain and depression, Plaintiff requires future medical treatment in order to effect a cure, to give relief, and/or to lessen his period of disability and Defendants are obligated to pay for such treatment. N.C. Gen. Stat. §§ 97-25; 97-25.1 (2009).
4. Dr. Thomas Kern Carlton, III is hereby designated as Plaintiff's authorized treating physician for the purpose of providing the future medical treatment Plaintiff requires for his September 5, 2007 work injury. N.C. Gen. Stat. § 97-25 (2009).
5. The burden is on Defendants to show that Plaintiff refused suitable employment. Gordon v. City of Durham,153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002). Once an employer makes this showing, the burden shifts to the employee to show that the refusal is justified. Moore v. Concrete Supply Co.,149 N.C. App. 381, 389-390, 561 S.E.2d 315, 320 (2002). *Page 16 
"[T]he fact that an employee is capable of performing employment tendered by the employer is not, as a matter of law, an indication of plaintiff's ability to earn wages." Saums v. Raleigh CommunityHospital, 346 N.C. 760, 764, 487 S.E.2d 746, 750 (1997). The tendered employment must accurately reflect the employee's ability to compete with others in the job market in order for the employment to be indicative of an employee's earning capacity. Peoples v. Cone Mills,Corp., 316 N.C. 426, 342 S.E.2d 798 (1986). Thus, "if other employers would not hire the employee with the employee's limitations at a comparable wage level . . . [or] if the proffered employment is so modified because of the employee's limitations that it is not ordinarily available in the competitive job market[,]" the job is "make work" and is not competitive. Id.
6. In the case at bar, Defendants failed to prove that the guard shack position was a "real job" which was available to Plaintiff at Defendant-Employer's place of employment. The Full Commission gives more weight to Plaintiff's testimony that Mr. Roger Short, a managerial employee who was in a supervisory position over Mr. Tompkins, advised him that the guard shack position was not a "real job," over the contrary testimony of Mr. Tompkins, considering the evidence presented that the guard shack position was an open position, but Defendant-Employer did not make it available to laid-off employees, that it was not advertised, and the greater weight of the other evidence of record. Peoples, 316 N.C. 426, 342 S.E.2d 798 (1986);Gordon, 153 N.C. App. 782, 787, 571 S.E.2d 48, 51 (2002).
7. Defendants also failed to prove that the guard shack position constituted suitable employment. There are several factors that are relevant in determining whether a particular job is suitable for a particular individual. The wages in the guard shack position would have been less than half of Plaintiff's pre-injury average weekly wage, and such disparity would not be a *Page 17 
true measure of Plaintiff's wage-earning capacity in the competitive employment market. "The disparity between pre-injury and post-injury wages is one factor which may be considered in determining the suitability of post-injury employment." Dixon v. City of Durham,128 N.C. App. 501, 504, 495 S.E.2d 380, 383, disc. review denied,348 N.C. 496, 510 S.E.2d 381 (1998). As such, the guard shack position is not indicative of any wage-earning capacity that Plaintiff may have.McClean v. Eaton Corp., 125 N.C. App. 391, 481 S.E.2d 289 (1997). In addition, the greater weight of the evidence indicates that it is unlikely employers other than Defendant-Employer would hire Plaintiff for a similar position at a comparable wage, or that the guard shack position afforded Plaintiff any potential for advancement or income growth. Saums, 346 N.C. 760, 764, 487 S.E.2d 746, 750 (1997);Peoples, 316 N.C. 426, 342 S.E.2d 798 (1986);Foster v. U.S. Airways, Inc.,149 N.C. App. 913, 563 S.E.2d 235, disc. review denied,356 N.C. 299, 570 S.E.2d 505 (2002); Dixon,128 N.C. App. 501, 495 S.E.2d 380, disc. review denied,348 N.C. 496, 510 S.E.2d 381 (1998); Jenkins v. Easco Aluminum,165 N.C. App. 86, 598 S.E.2d 252 (2004); Moore,149 N.C. App. 381, 389-390, 561 S.E.2d 315, 320 (2002). Further, there is a lack of sufficient evidence that Defendant-Employer either advertised the guard shack position or made it available in the open and competitive market place. Peoples,316 N.C. 426, 342 S.E.2d 798 (1986); Munns v. Precision Franchising,Inc., ___ N.C. App. ___, 674 S.E.2d 430 (2009); Smith v. Sealed AirCorp., 127 N.C. App. 359, 489 S.E.2d 445 (1997).
8. In addition, Plaintiff's "earning capacity must be measured not by the largesse of a particular employer, but rather by the employee's own ability to compete in the labor market [and] [w]ages paid an injured employee out of sympathy, or in consideration of his long service with the employer, clearly do not reflect his actual earning capacity. . . ."Peoples, 316 N.C. 426, 437, 342 S.E.2d 798, 805-806 (1986). The testimony of Mr. Ricky Tompkins that Defendants *Page 18 
"felt dedicated that he [Plaintiff] had been hurt on the job, so we brought him back to try to help him out and the company out" indicates that Defendants' motivation to offer Plaintiff the guard shack position was more out of sympathy than due to Plaintiff's legitimate employability in this position.
9. Plaintiff's refusal to accept the guard shack position when Defendant-Employer offered it to him in October 2008 was justifiable, not only because his treating physicians recommended pain management treatment that precluded his working in any job, but also because the job did not constitute suitable employment for Plaintiff. When Defendant-Employer initially offered Plaintiff the guard shack position in October 2008, he justifiably refused it in order to participate in a pain management program as recommended by his treating physicians. Accordingly, Defendants' contention that Plaintiff's ongoing temporary total disability compensation should be terminated for that refusal is without merit, and the Order denying Defendants' Form 24 in connection with this refusal was proper. N.C. Gen. Stat. § 97-32 (2009).
10. Although Plaintiff's treating physicians approved the guard shack position as being within his permanent work restrictions when Defendants offered it to him again in March 2009, Plaintiff's refusal was justifiable because the position continued to constitute unsuitable employment for Plaintiff for the reasons previously discussed. N.C. Gen. Stat. § 97-32 (2009).
11. Plaintiff satisfied prong one of Russell v. Lowes Prod.Distribution concerning medical disability from September 5, 2007 through November 13, 2007, the date upon which Plaintiff began a trial return to work for Defendant-Employer in a light-duty capacity. Russell v. Lowes Prod. Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). On February 22, 2008, Plaintiff again became medically disabled from any employment when Dr. Don Leo Hoover removed him from work due to increased lower back pain. Id. Although Dr. Jeffrey Andrew *Page 19 
Knapp released Plaintiff to return to work in a light-duty capacity on October 7, 2008, Plaintiff remained disabled from any employment under prong three of Russell, because Plaintiff's level of pain was severe enough to justify pain management treatment in an intensive functional restoration program and Plaintiff was awaiting authorization for such treatment. Therefore, any attempt to work during that period would have been futile. Id. Plaintiff again became medically unable to work when he enrolled in the functional restoration program offered by Dr. Carlton in December 2008. Dr. Carlton later opined that it was reasonable for Plaintiff to remain out of work while enrolled in this program. On January 21, 2009, Dr. Carlton discharged Plaintiff from the functional restoration program with permanent work restrictions and found him to be at maximum medical improvement. Thereafter, Plaintiff was capable of some work, but he was incapable of returning to his pre-injury employment. Plaintiff made reasonable but unsuccessful attempts to obtain suitable employment on his own and his refusal of the unsuitable guard shack position was justifiable. Thus, Plaintiff satisfied prong two of Russell and proved continuing disability from January 21, 2009 and continuing. Russell v. LowesProd. Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
12. Because neither party briefed or argued any issues related to whether Plaintiff's average weekly wage should be modified, the Full Commission deems this issue to be abandoned and will not address it.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD *Page 20 
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $673.23 per week from September 5, 2007 and continuing until further order of the North Carolina Industrial Commission. The accrued compensation shall be paid in a lump sum. Defendants are allowed a credit offset for any wages Plaintiff earned during his trial return to work.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's September 5, 2007 work injury, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. Dr. Thomas Kern Carlton, III is hereby designated as Plaintiff's authorized treating physician, and Defendants shall authorize and pay for the treatment that he either provides or recommends for Plaintiff's September 5, 2007 work injury, including, but not limited to any and all medical and/or psychological treatment/therapy which may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability.
4. A reasonable attorney's fee of 25 percent is hereby approved for Plaintiff's counsel from the sums due Plaintiff under paragraph one, above. Defendant shall deduct and pay directly to Plaintiff's counsel 25 percent of the accrued compensation owed to Plaintiff and every fourth compensation check thereafter.
. 5. Defendants shall pay the costs of these proceedings.
This the ___ day of July 2010.
 S/___________________ *Page 21 
BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ L AURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1